FRANK S. HEDIN (SBN 291289)
**HEDIN LLP**
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone:   (305) 357-2107
Facsimile:   (305) 200-8801
E-Mail:       fhedin@hedinllp.com

JULIAN HAMMOND (SBN 268489)
**HAMMONDLAW, P.C.**
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Telephone:   (310) 601-6766
Facsimile:   (310) 295-2385
E-Mail:       jhammond@hammondlawpc.com

*Counsel for Plaintiffs and Putative Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ARCHER; and TODD COHN, individually and on behalf of all others similarly situated, | Case No. 2:24-cv-10744-AB-JC |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT[1]** |
| v. | |
| NBCUNIVERSAL MEDIA, LLC and UNIVERSAL PICTURES HOME ENTERTAINMENT LLC d/b/a GRUV.COM, | (DEMAND FOR JURY TRIAL) |
| Defendants. | |

---

[1]     Plaintiffs file this First Amended Complaint with Defendants' "written consent" pursuant to Fed. R. Civ. P. 15(a)(2).

---

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Michael Archer and Todd Cohn, individually and on behalf of all others similarly situated, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to themselves or their counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1.     Plaintiffs bring this action to redress Defendants' practices of disclosing the personally identifying information of each of its customers, along with the specific titles of the prerecorded videos and other audiovisual materials they each requested on its e-commerce websites, to Meta Platforms, Inc. ("Meta") – in clear violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 et seq. ("VPPA").

2.     Over the past two years, Defendants' e-commerce websites, including gruv.com, have been programmed to systematically transmit, via "Meta Pixel" technology that Defendants chose to install on those websites for marketing purposes, the personally identifying information of all of their Facebook-enrolled customers to Meta.

3.     The information Defendants have disclosed (and continue to disclose) to Meta via the Meta Pixel technology includes each Facebook-enrolled customer's Facebook ID ("FID"), along with the specific title(s) of the prerecorded video(s) that each of them requested for purchase on Defendants' websites.

4.     An FID is a unique sequence of numbers linked to a specific Meta profile. A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person.  In the simplest terms, the Meta Pixel that Defendants have installed on their websites,

FIRST AMENDED CLASS ACTION COMPLAINT

including gruv.com, captures and discloses to Meta information that reveals that a particular person requested a specific prerecorded video (by title) for purchase on that website (hereinafter, "Private Video Information").

5.    Defendants disclosed and continue to disclose their customers' Private Video Information to Meta without asking for, let alone obtaining, their informed written consent to these practices.

6.    The VPPA clearly prohibits what Defendants have done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

7.    Accordingly, on behalf of themselves and the putative Class members defined below, Plaintiffs bring this First Amended Class Action Complaint against Defendants for intentionally and unlawfully disclosing their and Class members' Private Video Information to Meta.

## PARTIES

### I.    Plaintiff Michael Archer

8.    Plaintiff Archer is, and at all times relevant hereto was, a citizen and resident of Jefferson Parish, Louisiana.

9.    Plaintiff Archer is, and at all times relevant hereto was, a user of Meta.

10.    Plaintiff Archer is a consumer of the video products and services offered on Defendants' gruv.com website.  On or about November 17, 2023, Plaintiff Archer requested prerecorded video material from Defendants' gruv.com website by visiting that website, selecting a specific prerecorded video advertised for sale on that website, and clicking a button on that website to "add" the selected prerecorded video to his "cart," at which point he was directed to a checkout screen where he purchased and

FIRST AMENDED CLASS ACTION COMPLAINT

thus obtained the requested video (by providing his name, email address, home address for shipment, and payment details). Accordingly, Plaintiff Archer requested and obtained, and is therefore a consumer of, prerecorded video material sold by Defendants on their gruv.com website.

11.    At all times relevant hereto, including when requesting and obtaining prerecorded video material from Defendants' gruv.com website, Plaintiff Archer maintained a Meta account (and was logged into such account), a Meta profile displaying his full name, and an FID associated with such profile.

**II.    Plaintiff Todd Cohn**

12.    Plaintiff Cohn is, and at all times relevant hereto was, a citizen and resident of Boca Raton, Florida.

13.    Plaintiff Cohn is, and at all times relevant hereto was, a user of Meta.

14.    Plaintiff Cohn is a consumer of the video products and services offered on Defendants' gruv.com website.  On or about January 5 and 9, 2025, Plaintiff Cohn requested prerecorded video material from Defendants' gruv.com website by visiting that website, selecting specific prerecorded videos advertised for sale on that website, and clicking a button on that website to "add" the selected prerecorded videos to his "cart," at which point he was directed to a checkout screen where he purchased and thus obtained the requested videos (by providing his name, email address, home address for shipment, and payment details). Accordingly, Plaintiff Cohn requested and obtained, and is therefore a consumer of, prerecorded video material sold by Defendants on their gruv.com website.

15.    At all times relevant hereto, including when requesting and obtaining prerecorded video material from Defendants' gruv.com website, Plaintiff Cohn maintained a Meta account (and was logged into such account), a Meta profile displaying his full name, and an FID associated with such profile.

FIRST AMENDED CLASS ACTION COMPLAINT

### III.    Defendants

16.    Defendant NBCUniversal Media, LLC is a foreign corporation existing under the laws of the State of Delaware with a principal place of business at 30 Rockefeller Plaza, Manhattan, New York 10112.  Defendant NBCUniversal Media, LLC is one of the world's largest media and entertainment companies that operates, governs, and controls several studio companies and their development, production, acquisition, marketing, and distribution of filmed entertainment worldwide. Defendant NBCUniversal Media, LLC operates, governs, oversees, and controls the operations of these companies.

17.    Defendant Universal Pictures Home Entertainment LLC is a foreign corporation existing under the laws of the State of Delaware with a principal place of business at 100 Universal City Plaza, Universal City, CA 91608. Defendant Universal Pictures Home Entertainment LLC is a subdivision within Defendant NBCUniversal Media, LLC that operates the website gruv.com under its governance and control.

18.    Defendants, through their e-commerce websites, including the website gruv.com, advertise, make available for sale, and sell prerecorded video materials to consumers, including movies, television shows, and more, in DVD, Blu-ray, and digital formats.

### JURISDICTION AND VENUE

19.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

20.    Personal jurisdiction and venue are proper because Defendant Universal Pictures Home Entertainment LLC maintains its headquarters and principal place of business in Los Angeles, California, within this judicial District. Moreover, personal jurisdiction and venue are also proper because Defendant NBCUniversal Media, LLC manages and governs the sale of prerecorded video content by Defendant Universal Pictures Home Entertainment LLC on the gruv.com website.

FIRST AMENDED CLASS ACTION COMPLAINT

# VIDEO PRIVACY PROTECTION ACT

21.    The VPPA prohibits companies (like Defendants) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers (like Plaintiffs) as having requested or obtained specific video(s) or other audio-visual materials.

22.    Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"  18 U.S.C. § 2710(b)(1).  The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

23.    Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes."  *Id.*  Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

FIRST AMENDED CLASS ACTION COMPLAINT

24.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes."  134 Cong. Rec. S5399 (May 10, 1988).  As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people."  *Id*.

25.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21[st] Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[2]

26.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that

---

[2] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the- 21stcentury.

FIRST AMENDED CLASS ACTION COMPLAINT

consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[3]

27.    In this case, however, Defendants deprived Plaintiffs and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Video Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

28.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[4]

29.    Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[5]

30.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that: "Most consumers cannot begin to comprehend the types and amount of information collected

---

[3] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

[4] Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[5] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

FIRST AMENDED CLASS ACTION COMPLAINT

by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit."[6]

31.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[7]

32.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

33.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

---

[6] Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[7] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

[8] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[9] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

FIRST AMENDED CLASS ACTION COMPLAINT

34.     Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[10]

35.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Defendants share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

36.     Disclosures like Defendants' are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are

---

[10] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[11] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

FIRST AMENDED CLASS ACTION COMPLAINT

often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]

37.    The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

38.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.    Thus, information disclosures like Defendants' are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

39.    Defendants are not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice. Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

40.    As the data aggregation industry has grown, so too have consumer concerns regarding the privacy of personal information.

41.    A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who

---

[12] *Id.*

[13] Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).

[14] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

they believe do protect their privacy online.[15] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

42.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.  In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

43.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

---

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

FIRST AMENDED CLASS ACTION COMPLAINT

44.    Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]   As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

## III.    Defendants Use the Meta Pixel to Systematically Disclose Their Customers' Private Video Information to Meta

45.    As alleged below, whenever a Facebook-enrolled consumer requests a prerecorded video product available for purchase (by adding it to his or her shopping cart) on one of Defendants' e-commerce websites, including gruv.com, the Meta Pixel technology that Defendants intentionally installed on that website transmits to Meta, *inter alia,* (1) the unencrypted FID of the consumer; (2) detailed information revealing the title(s) of the prerecorded video requested by the consumer; and (3) the URL where the requested video is available for purchase – all without the consumer's consent, and in clear violation of the VPPA.

### A.    The Meta Pixel

46.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[20] Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

47.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This

---

[19] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.
[20] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

FIRST AMENDED CLASS ACTION COMPLAINT

allows companies like Defendants to build detailed profiles about their customers and to serve them with highly targeted advertising.

48.    Additionally, the Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[21]  This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[22] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.

49.    As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[23]

50.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[24]

51.    Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

---

[21] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[22] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

[23] Meta, "About Meta Pixel," available at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[24] Meta, "Meta Business Tools Terms," available at https://www.facebook.com/legal/technology_terms.

FIRST AMENDED CLASS ACTION COMPLAINT

52.    Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[25]

53.    Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[26]

54.    The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[27]

55.    Website operators use the Meta Pixel to send information about visitors to their websites to Meta.  Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

56.    Depending on the configuration of the Meta Pixel, the website may also send Event Data to Meta.  In this case, Defendants have configured the Meta Pixel on their websites, including gruv.com, to send custom Event Data to Meta, including when a user clicks the "add to cart" button.

57.    When website operators make transmissions to Meta through the Meta Pixel, neither the visitor's FID, the website URL, nor the Event Data are hashed or encrypted.

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

58.     Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[28]

59.     Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

60.     Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

61.     Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[29] including, as relevant here, the specific prerecorded video material that they requested or obtained from Defendants' website.

## B.    Defendants Knowingly Use the Meta Pixel to Transmit the Private Video Information of their Customers to Meta

62.     Defendants sell various prerecorded video materials, including movies, films, musicals, and more, which are in the form of DVDs, Blu-rays, and digital products, on their websites, including gruv.com.

---

[28] *See id*.

[29] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

FIRST AMENDED CLASS ACTION COMPLAINT

63.    To purchase prerecorded video material from Defendants' websites, including gruv.com, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

64.    When requesting or obtaining prerecorded video materials from Defendants' websites, including gruv.com, Defendants use – and have used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who requests prerecorded video material on such websites (by adding such material to their shopping cart for purchase), the specific title of video material that the person requested (as well as the URL where such video material is available for purchase).

65.    In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendants intentionally programmed (by following step-by-step instructions from Meta's website) their websites, including gruv.com, to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who requests prerecorded video material on their websites, including gruv.com, along with the specific title of the prerecorded video material that the person requested.

66.    With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person requested  from Defendants' websites (including from gruv.com) —all of which Defendants knowingly and systematically provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the subscription or the title of the specific prerecorded video material that the person requested.  This can be accomplished simply by accessing the URL www.facebook.com/ and inserting the person's FID.

67.    Defendants' practice of disclosing the Private Video Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.   At all times relevant hereto, whenever Plaintiffs or any other persons requested a prerecorded video from Defendants on one of their

FIRST AMENDED CLASS ACTION COMPLAINT

websites (by adding such material to their shopping cart), including on the gruv.com website, Defendants disclosed to Meta (*inter alia*) the specific title of the video material that was requested (including the URL where such material is available for purchase), along with the FID of the person who requested it (which, as discussed above, uniquely identified the person).

68.    At all times relevant hereto, Defendants knew the Meta Pixel was disclosing their customers' Private Video Information to Meta.

69.    Although Defendants could easily have programmed their websites, including gruv.com, so that none of their customers' Private Video Information is disclosed to Meta, Defendants instead chose to program their websites so that all of their customers' Private Video Information is systematically disclosed to Meta.

70.    Before transmitting Plaintiffs' or their other customers' Private Video Information to Meta, Defendants failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

71.    By intentionally disclosing to Meta Plaintiffs' and their other customers' FIDs together with the specific title of the prerecorded video material that they each requested for purchase, without any of their consent to these practices, Defendants knowingly violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

72.    Plaintiffs seek to represent a class defined as all natural persons in the United States who, during the two years preceding the filing of this action and while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc., purchased prerecorded video material or services from Defendants' websites (including gruv.com).

73.    Class members are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in at least the tens of thousands.  The precise number of Class members and their identities are

FIRST AMENDED CLASS ACTION COMPLAINT

unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the Defendants' customer records.

74.    Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether Defendants embedded Meta Pixel on their websites that monitors and tracks actions taken by visitors to their websites; (b) whether Defendants report the actions and information of visitors to Meta; (c) whether Defendants knowingly disclosed Plaintiffs' and Class members' Private Video Information to Meta; (d) whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether Plaintiffs and Class members are each entitled to a statutory damage award of $2,500, as provided by the VPPA.

75.    The named Plaintiffs' claims are typical of the claims of the Class in that the Defendants' conduct toward the putative class is the same. That is, Defendants embedded the Meta Pixel on their websites (including gruv.com) to monitor and track actions taken by consumers on their websites and report this to Meta. Further, the named Plaintiffs and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendants' uniform and wrongful conduct in intentionally disclosing their Private Video Information to Meta.

76.    Plaintiffs are adequate representatives of the Class because they are interested in the litigation; their interests do not conflict with those of the Class members they seek to represent; they have retained competent counsel experienced in prosecuting class actions; and they intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members.

FIRST AMENDED CLASS ACTION COMPLAINT

77.    The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.    Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION

### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

78.    Plaintiffs repeat the allegations asserted in the preceding paragraphs as if fully set forth herein.

79.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

80.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]"  Defendants are each a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because they engaged in the business of selling and delivering

FIRST AMENDED CLASS ACTION COMPLAINT

prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

81.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiffs and Class members are each a "consumer" within the meaning of the VPPA because they each requested and/or obtained prerecorded video material or services from Defendants that were sold and delivered to them by Defendants.

82.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Private Video Information pertaining to Plaintiffs and Class members that Defendants transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiffs and Class members to Meta as an individual who "requested" specific prerecorded video material from Defendants' websites (including the gruv.com website).

83.    On or about November 17, 2023, Plaintiff Archer "requested . . . specific video materials," 18 U.S.C. § 2710(a)(3), from Defendants by clicking the "add to cart" button on Defendants' gruv.com website to "add" a prerecorded video selected by Plaintiff Archer to his shopping "cart."

84.    On or about January 5 and 9, 2025, Plaintiff Cohn "requested . . . specific video materials," 18 U.S.C. § 2710(a)(3), from Defendants by clicking the "add to cart" button on Defendants' gruv.com website to "add" prerecorded videos selected by Plaintiff Cohn to his shopping "cart."

85.    When Plaintiffs (and each Class member) clicked the "add to cart" button on Defendants' gruv.com website to request a specific prerecorded video material from Defendants, Defendants disclosed to Meta, *inter alia*, (1) their FIDs (and all personally identifiable information associated with their Facebook accounts), (2) the specific titles

of the prerecorded videos that they had requested, and (3) the URLs where the prerecorded videos requested by them are available for purchase, as shown in the following snipit of source code obtained by undersigned counsel from Defendants' gruv.com website in the course of their investigation into this matter:



86.    Prior to and at the time Plaintiffs requested or obtained prerecorded video material from Defendants, Defendants failed to obtain Plaintiffs' informed written consent authorizing Defendants to disclose their Private Video Information to Meta or any other third party.  More specifically, at no time prior to or during the applicable statutory period did Defendants obtain from any person who requested or obtained prerecorded video material or services on Defendants' websites (including either of the Plaintiffs or any Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn

by the consumer, whichever is sooner, or that was given after Defendants provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

87.    By nevertheless disclosing Plaintiffs' Private Video Information (including their FIDs, unique identifiers, and the fact that they had requested prerecorded video material from Defendants' website) to Meta, a third party, during the applicable statutory period, Defendants violated Plaintiffs' rights under the VPPA and invaded their statutorily conferred interest in keeping such information (which bears on their personal affairs and concerns) private.

88.    Defendants knowingly disclosed Plaintiffs' and Class members' Private Video Information to Meta via the Meta Pixel technology because Defendants intentionally installed and programmed the Meta Pixel code on their websites (including gruv.com), knowing that such code would transmit, *inter alia*, the titles of the prerecorded video material requested or obtained by their consumers and the consumers' unique identifiers (including FIDs).

89.    By disclosing Plaintiffs' and Class members' Private Video Information to Meta without their informed written consent, Defendants violated Plaintiffs' and Class members' statutorily protected right to privacy in their Private Video Information.

90.    Consequently, Defendants are liable to each of the Plaintiffs and Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendants as follows:

FIRST AMENDED CLASS ACTION COMPLAINT

a)      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

b)      For an order declaring that Defendants' conduct as described herein violated the VPPA;

c)      For an order finding in favor of Plaintiffs and the Class and against Defendants on all counts asserted herein;

d)      For an award of $2,500.00 to each of the Plaintiffs and each Class member, as provided by 18 U.S.C. § 2710(c);

e)      For an order permanently enjoining Defendants from disclosing the Private Video Information of its customers to third parties in violation of the VPPA;

f)      For prejudgment interest on all amounts awarded; and

g)      For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiffs and the Class under Rule 23 and 18 U.S.C. § 2710(c).

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and claims so triable.

Dated:  February 19, 2025                          Respectfully submitted,

By: /s/ *Frank S. Hedin*

FRANK S. HEDIN (SBN 291289)
**HEDIN LLP**
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
E-Mail:        fhedin@hedinllp.com

JULIAN HAMMOND (SBN 268489)
**HAMMONDLAW, P.C.**
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Telephone:   (310) 601-6766
Facsimile:    (310) 295-2385

24

FIRST AMENDED CLASS ACTION COMPLAINT

E-Mail:       jhammond@hammondlawpc.com

*Counsel for Plaintiffs and Putative Class*

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28