FRANK S. HEDIN (SBN 291289)
**HEDIN LLP**
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone:   (305) 357-2107
Facsimile:   (305) 200-8801
E-Mail:      fhedin@hedinllp.com

JULIAN HAMMOND (SBN 268489)
**HAMMONDLAW, P.C.**
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Telephone:   (310) 601-6766
Facsimile:   (310) 295-2385
E-Mail:      jhammond@hammondlawpc.com

*Counsel for Plaintiffs and Putative Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ARCHER; and TODD COHN, individually and on behalf of all others similarly situated, | Case No. 2:24-cv-10744-AB-JC |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS** |
| v. | |
| NBCUNIVERSAL MEDIA, LLC and UNIVERSAL PICTURES HOME ENTERTAINMENT LLC d/b/a GRUV.COM, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

**I.    INTRODUCTION** ...................................................................................**1**

**II.   RELEVANT BACKGROUND** ..............................................................**2**

   A.   STATUTORY BACKGROUND ...............................................................2

   B.   FACTUAL AND PROCEDURAL BACKGROUND ......................................3

**III. LEGAL STANDARD** .............................................................................**5**

**IV.   ARGUMENT** ..........................................................................................**6**

   A.   THE FAC SUFFICIENTLY ALLEGES DISCLOSURE OF PII. .....................7

   B.   PLAINTIFFS ARE CONSUMERS UNDER THE VPPA. ..............................13

   C.   DEFENDANTS KNEW THAT THEY WERE MAKING PROHIBITED DISCLOSURES. .........18

      1.   Defendants knew what identifying information they disclosed. ....................18

      2.   Defendants knew that they disclosed "consumers'" PII...............................22

**V.   CONCLUSION** ......................................................................................**24**

1

# **TABLE OF AUTHORITIES**

2

**CASES**

3    *Ashcroft v. Iqbal*,
        556 U.S. 662 (2009)..................................................................................6

4
    *Bell Atl. Corp. v. Twombly*,
5       550 U.S. 544 (2007)..................................................................................5

6    *Carter v. Scripps Networks, LLC*,
        No. 22-cv-2031, 670 F.Supp.3d 90 (S.D.N.Y. Apr. 24, 2023)................14
7
    *Cook v. GameStop, Inc.*,
8       689 F. Supp. 3d 58 (W.D. Pa. 2023).........................................................8

9    *Eichenberger v. ESPN, Inc.*,
        876 F.3d 979 (9th Cir. 2017) ............................................................passim
10
    *Ellis v. Cartoon Network, Inc.*,
11      803 F.3d 1251 (11th Cir. 2015) ...............................................................13

12   *Fan v. NBA Properties Inc.*,
        No. 23-CV-05069-SI, 2024 WL 1297643 (N.D. Cal. Mar. 26, 2024)....22
13
    *Ghanaat v. Numerade Labs, Inc.*,
14      689 F. Supp. 3d 714 (N.D. Cal. 2023) .....................................................22

15   *Hinds Invs., L.P. v. Angioli*,
        654 F.3d 846 (9th Cir. 2011) .....................................................................6
16
    *In re Hulu Priv. Litig.*,
17      86 F. Supp. 3d 1090 (N.D. Cal. 2015) ................................................7, 12

18   *In re Hulu Priv. Litig.*,
        No. C 11–03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .....20
19
    *India Price v. Carnival Corp.*,
20      712 F. Supp. 3d 1347 (S.D. Cal. 2024).....................................................9

21

ii

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991) .......................................................................6

*Mollett v. Netflix, Inc.*,
    795 F.3d 1062 (9th Cir. 2015) ......................................................................6

*N. Star Int'l v. Arizona Corp. Comm'n*,
    720 F.2d 578 (9th Cir. 1983) ........................................................................5

*Retamco Operating, Inc. v. Carone*,
    No. CV 04-2997 CBM (RZX), 2004 WL 7338703 (C.D. Cal. Aug. 27, 2004) ........6

*Rodriguez v. JP Boden Servs. Inc.*,
    No. 23-CV-00534-L-VET, 2024 WL 559228 (S.D. Cal. Feb. 12, 2024)..........16, 17

*Smith v. Trinity Broad. of Texas, Inc.*,
    No. 8:24-CV-01046-JVS-ADS, 2024 WL 4394557
    (C.D. Cal. Sept. 27, 2024)....................................................19, 20, 21, 22

*Tawam v. Feld Ent. Inc.*,
    684 F. Supp. 3d 1056 (S.D. Cal. 2023)......................................13, 14, 15

**STATUTES**

18 U.S.C. § 2710 ...........................................................................passim

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ..............................................5

**OTHER SOURCES**

134 Cong. Rec. S5397-01 ..............................................................1

S. REP. 599, 2, 1988 U.S.C.C.A.N. 4342-1, 4342-1 .............................2,3,7

1  Plaintiffs respectfully submit this memorandum of law in opposition to

2  Defendants' Motion to Dismiss Class Action Complaint, ECF No. 25.

## I.    INTRODUCTION

4  Plaintiffs bring a single claim against Defendants for violating the Video Privacy

5  Protection Act, 18 U.S.C. § 2710 ("VPPA").  When Plaintiffs and other consumers

6  requested or obtained videos from gruv.com, an e-commerce website that sells pre-

7  recorded video materials, Defendants sent their personally identifiable information

8  ("PII") to Meta Platforms, Inc. ("Meta") in violation of the VPPA.  *Id.* ¶¶ 1-3.

9  Defendants now move to dismiss the FAC, asserting that: 1) Plaintiffs do not allege

10  the disclosure of PII as defined by the VPPA; 2) Plaintiffs are not "consumers" within

11  the meaning of the VPPA; and 3) Plaintiffs do not allege that Defendants "knowingly"

12  disclosed identifying information of qualifying "purchasers."

13  Defendants' arguments are without merit.  In moving to dismiss, Defendants

14  distort a law designed to protect consumers' "reasonable expectation of privacy" in

15  what "we watch with our family in our own homes," 134 Cong. Rec. S5397-01, 1988

16  WL 170802 (Sen. Patrick Leahy's Statement on Introduced Bill), into one that

17  overlooks companies like Defendants who intentionally trade in their consumers'

18  private viewing habits for profit.  That outcome is not supported by the text or spirit of

19  the VPPA or the caselaw interpreting it.  For the reasons discussed below, Defendants'

20  motion should be swiftly denied.

21  ///

1

## II.    RELEVANT BACKGROUND

**A.    Statutory Background**

The Video Privacy Protection Act (VPPA) was enacted in 1988 "to extend privacy protection to records that contain information about individuals." S. REP. 599, 2, 1988 U.S.C.C.A.N. 4342-1, 4342-1. As the legislative history explains, the VPPA was drafted in response to a disclosure of Judge Robert Bork's video rental history, as Congress wished to "allow[] consumers to maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." Id. at 8. Its substantive provisions prohibit a provider of prerecorded videos from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the consumer's "informed, written consent" and the opportunity to opt out. 18 U.S.C. § 2710.

The VPPA was drafted with the expansion of technological tracking of consumers in mind. Congress was concerned that in a technological era in which consumer activities are "all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what . . . sort of television programs they watch," which members likened to "Big Brother." Id. at 5–6.  The Senate Report also cited Supreme Court opinions in which the Court "warned of the danger that new technologies would chip away at traditional privacy safeguards" and of "the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks." Id. at 4–5 (citations omitted).

2

As such, "[t]he VPPA does not protect only against harms such as embarrassment and harassment. . . . Rather, the statute also protects privacy interests more generally by ensuring that consumers retain control over their personal information." *Id*. That is, because the VPPA "identifies a substantive right to privacy that suffers any time a video service provider discloses otherwise private information," every violation "presents the precise harm and infringes the same privacy interests Congress sought to protect by enacting the VPPA." *Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 983–84 (9th Cir. 2017) (citation omitted).

**B.      Factual and Procedural Background**

Over the years, Defendants regularly, knowingly, and intentionally disclosed identifying information about their customers along with information about the "specific titles of the prerecorded videos" those customers requested or obtained to Meta via a programming code known as the Meta Pixel.  FAC ¶¶ 1-3, 65.

In order to take advantage of targeted advertising services offered by Meta, Defendants intentionally installed the Meta Pixel on their e-commerce websites, including www.gruv.com, where they sell prerecorded videos movies, television shows and more in DVD, Blu-ray, and digital formats.  *Id*. ¶¶ 18, 65.  Meta advertises its Metal Pixel as being able to "match [] website visitors to their respective Facebook User accounts" and track the actions that users with Meta accounts take on websites, including actions like adding an item to a shopping cart or making a purchase.  *Id*. ¶¶ 48-49.  The Meta Pixel code systematically transmits to Meta information including

3

the unencrypted Facebook IDs ("FIDs") of each person with a Meta account, detailed information about the specific video titles that each customer requested or obtained, and the corresponding URLs where those videos were available for purchase. *Id.* ¶ 45, 69.  Meta's Business Tools Terms, which every website operator must agree to before installing the Meta Pixel, state that the Meta Pixel can be used to transmit "Event Data" and "Contact Information" of website visitors to Meta.  *Id.* ¶¶ 51, 58.  "Event Data" includes things like "information that you [website operators] share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installation of your apps, and purchases of your products." *Id.* ¶ 54.  Meta defines "Contact Information" as "*information that personally identifies individuals*, such as names, email addresses, and phone numbers." *Id.* ¶¶ 50-52 (emphasis added). The Business Tool Terms state that website operators, "instruct us to process the Contact Information solely to match the Contact Information against user IDs ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data." *Id.* ¶ 53.  The Metal Pixel can also be configured to send Event Data to Meta, and Defendants have configured the Pixel on their sites to send Event Data to Meta, including "add to cart" requests.  *Id.* ¶ 56.

Meta has used the Meta Pixel to amass a vast digital database of highly detailed PII about its billions of users worldwide.  *Id.* ¶ 60.  It monetizes this Orwellian database by selling to advertisers the ability to serve highly targeted advertisements to the persons whose personal information has been taken.  *Id.*  Websites operators like

4

1    Defendants are able to track visitors to their websites and the actions those visitors

2    take, including the specific video titles that specific visitors request or obtain from the

3    websites. *Id.* ¶ 61. With the information that Defendants transmit to Meta, e.g., their

4    website visitors' FIDs and information on the prerecorded video titles they requested

5    or obtained, any ordinary person can learn the identity of the person to whom the FID

6    corresponds and thus learn the specific titles that person requested or obtained. *Id.* ¶

7    66.

8         On December 13, 2024, Plaintiff Michael Archer commenced this action to

9    redress Defendants' widescale violations of the VPPA. ECF No. 1. On January 16,

10   2025, Plaintiff Todd Cohn filed a separate complaint against Universal Pictures Home

11   Entertainment, LLC, in the U.S. District Court for the Southern District of New York.

12   On February 19, 2025, Plaintiffs jointly filed the FAC in this matter to proceed in a

13   single action against Defendants. On March 5, 2025, Defendants moved to dismiss.

14   ECF No. 25.

15              **III.   LEGAL STANDARD**

16        In considering a motion to dismiss under Federal Rule of Civil Procedure

17   12(b)(6), the Court must "accept all material allegations in the complaint as true and

18   construe them in the light most favorable to" the nonmoving party. *N. Star Int'l v.*

19   *Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983). To survive dismissal, a

20   plaintiff's complaint must plead "enough facts to state a claim to relief that is plausible

21   on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial

5

1   plausibility when the plaintiff pleads factual content that allows the court to draw the

2   reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

3   *v. Iqbal*, 556 U.S. 662, 678 (2009).   "Determining whether a complaint states a

4   plausible claim for relief" is "a context-specific task that requires the reviewing court

5   to draw on its judicial experience and common sense.'" *Id.* at 679.  Dismissal is only

6   proper under Rule 12(b)(6) when there is "a lack of a cognizable legal theory or the

7   absence of sufficient facts alleged under a cognizable legal claim." *Hinds Invs., L.P.*

8   *v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citation omitted).  Under Rule 12(b)(6),

9   "[t]he party moving for dismissal bears the burden of proving that no claim has been

10   stated." *Retamco Operating, Inc. v. Carone*, No. CV 04-2997 CBM (RZX), 2004 WL

11   7338703, at *3 (C.D. Cal. Aug. 27, 2004) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*,

12   926 F.2d 1406, 1409 (3d Cir. 1991)).

## IV.  ARGUMENT

14       A "plausible claim" under the VPPA is one that alleges "(1) the defendant is a

15   'video tape service provider,' (2) the defendant disclosed 'personally identifiable

16   information concerning any customer' to 'any person,' (3) the disclosure was made

17   knowingly, and (4) the disclosure was not authorized by" the statutory exceptions.

18   *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).  Plaintiffs have clearly

19   and sufficiently alleged all four elements.  Defendants challenge only the second and

20   third elements. However, their argument runs contrary to the overwhelming weight of

21   authority as well as the Plaintiffs' own allegations.  The Motion should be denied.

6

1    **A.    The FAC sufficiently alleges disclosure of PII.**

2         Defendants argue first that Plaintiffs fail to allege a disclosure of PII.  Mot. at 6-

3    10.  Defendants' theory is that because Defendants configured the tracking tools on

4    their website to share Plaintiffs' and other consumers' video-viewing habits at the

5    moment they click to add specific videos to their carts and not at the precise time of

6    checkout, Defendants are not in violation of the VPPA.  This "clever workaround" is

7    not supported by the law and goes against VPPA's very purpose to protect privacy of

8    individuals by protecting disclosure of "personally identifiable information" –

9    information that links the customer or patron to particular materials or services."   S.

10   REP. 599, 7, 1988 U.S.C.C.A.N. 4342-1, 4342-1.

11        Defendants acknowledge that the Ninth Circuit has "construed PII to 'mean[] …

12   information that would readily permit an ordinary person to identify a specific

13   individual's video-watching behavior.'"  Mot. at 7 (quoting *Eichenberger v. ESPN,*

14   *Inc.*, 876 F.3d 979, 985 (9th Cir. 2017)); *see also In re Hulu Priv. Litig.*, 86 F. Supp. 3d

15   1090, 1095 (N.D. Cal. 2015) ("[T]he video provider must have knowingly disclosed:

16   1) a consumer's identity; 2) the identity of "specific video materials"; and 3) the fact

17   that the person identified "requested or obtained" that material.").  Yet, Defendants

18   argue that "[t]he act of placing an item in a real or virtual cart is, at most, information

19   related to the Plaintiffs' product preferences."  Mot. at 7 (citation and internal quotation

20   marks omitted).

21        But Plaintiffs plainly do not *only* allege that Defendants shared information

7

1    about what went into visitors' carts.  For example, they allege that "Defendants

2    disclosed to Meta, *inter alia*, (1) their FIDs (and all personally identifiable information

3    associated with their Facebook accounts), (2) the specific titles of the prerecorded

4    videos that they had requested, and (3) the URLs where the prerecorded videos

5    requested by them are available for purchase."  FAC ¶ 85.  They allege that Defendants

6    violated their rights under the VPPA by "disclosing Plaintiffs' [PII] (including their

7    FIDs, unique identifiers, and the fact that they had requested prerecorded video

8    material from Defendants' website) to Meta, a third party."  *Id.* ¶ 87.  And they allege

9    that the information that Defendants transmit "allows Meta" or "any ordinary person"

10   to "learn the identity of the person to whom the FID corresponds and the subscription

11   or the title of the specific prerecorded video material that the person requested."  *Id.* ¶¶

12   48, 66.

13         The foregoing allegations are among the reasons why Defendants' reliance on

14   *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58 (W.D. Pa. 2023), Mot. at 7, is misplaced.

15   For one thing, *Cook* involved alleged violations of Pennsylvania's Wiretapping and

16   Electronic Surveillance Control Act and a related tort, and the court did not even

17   mention the VPPA.  But even on the issue of interception of personal information, that

18   case was different.  As the court explained:

19               Perhaps more notable than what she allegedly did on GameStop's
                 website is what she did **not** do.  Ms. Cook did not enter any
20               personally identifying information at any point during her
                 interaction.  Not her name.  Not her address.  Not her credit card
21               information.  Nothing that could connect her browsing activity

8

1        to **her**.  She also doesn't allege that GameStop did anything to figure out who she was, either.  In effect, everything Ms. Cook did on GameStop's website was completely anonymous.

2

3    *Id.* at 65–66.  As a later court explained, *Cook* and similar cases "center[ed] their

4 reasoning on the plaintiffs' failure to plead that defendants had intercepted personal

5 information or something beyond mere 'shopping preferences.'" *India Price v.*

6 *Carnival Corp.*, 712 F. Supp. 3d 1347, 1356 (S.D. Cal. 2024) (other citations omitted).[1]

7 Defendants might wish that this case were *Cook*, but it's not.  Plaintiffs have clearly

8 and coherently alleged how Defendants disclosed information, in connection with

9 requesting and obtaining products, which connect customer's identity to the videos

10 requested

11    Defendants do acknowledge that "[a] disclosure that a person added a video title

12 to a shopping cart *might reveal information about a specific person and a video title* .

13 . . .") (emphasis added). Mot. at 9.  But they then assert that those allegations are not

14 enough because "GRUV couldn't make that connection at the time of the alleged

15 disclosures, given that they occurred before either Plaintiff requested to purchase or

16 purchased anything." Mot. at 9.  That argument is not persuasive.  First, it is not clear

17

---

18 [1] At one point, Defendants rely on *Cook* to try to minimize the significance of their disclosing information about what customers place in their carts: "The act of placing an item in a real or 'virtual cart' is, 'at most, information related to the Plaintiffs' product preferences.'"  Mot. at 7 (quoting *Cook*, cleaned up).  When dealing with the *VPPA* and consumers transacting with video tape service providers, it is hard to see how "product preferences" fail to relate, if not equate, to the sort of "video-watching behavior" that the VPPA was designed to protect.

19

20

21

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS - 24-CV-10744-AB-JC

1    why Defendants or Meta or anyone else would have been unable to connect the dots

2    between a customer's PII and the specific title that they requested just because the

3    customer hadn't yet completed a purchase.  As alleged in the FAC, before purchase,

4    including when a request was made, the information transmitted to Meta included the

5    "[content_name]" connected to the "AddToCart" request along with the FID that

6    disclosed the user's PII.  *See* FAC ¶ 85 (source code snippet).  The connection that was

7    already coherent before the act of purchasing.  And the act of purchasing didn't need

8    to tell Defendants what they already knew—that the information they transmitted to

9    Meta Pixel *would* reveal the connection between the consumer and the video titles they

10   requested or purchased.  Otherwise, why bother installing the Meta Pixel in the first

11   place?  Second, it is not true that Defendants' disclosures occurred exclusively before

12   Plaintiffs requested or purchased.  As Plaintiffs allege, "whenever Plaintiffs or any

13   other persons requested a prerecorded video . . . (by adding such material to their

14   shopping cart) . . . Defendants disclosed to Meta (*inter alia*) the specific title of the

15   video material that was requested . . . along with the FID of the person who requested

16   it (which . . . uniquely identified the person)."  FAC ¶ 67.  In other words, the FAC

17   alleges that the disclosures occurred at the time of request.

18       This takes us to Defendants' insistence that the "add to cart" action is not a

19   request because it is analogous to "walking around a [video store] with a copy of [a

20   movie] in his or her shopping cart.  Mot. at 8.  Not so.  As the Ninth Circuit

21   acknowledges in *Eichenberger*, "modern technology may indeed alter—or may

10

1  already have altered—what qualifies under the statute."  876 F.3d at 986.  The FAC

2  alleges that when a customer clicks an "add to cart" button, they are making a request

3  from Defendants for that title.  FAC ¶ 85.  What happens after customers make that

4  "request" is not as simple as a customer at a brick-and-mortar taking a physical DVD

5  and putting it into their basket.[2]  Rather, the click generates a request to gruv.com for

6  a specific title and that's when gruv.com takes over, generates a checkout page and

7  places the requested item in the "cart" for customers.  *Id.* ¶¶ 10, 14, 85.  When the user

8  makes a request to add something to a shopping cart through a click, the website thus

9  generates an additional page and stores the title there for the user to purchase.  The fact

10  that Defendants received the request and *acted* on it is evidenced by, among other

11  things, the fact that code is generated which is then transmitted it to Meta.  *Id.*  That

12  code expressly recognizes an "AddToCart" request has been made.  *Id.*  Customers do

13  not and cannot do any of this.  Defendants do.[3]

14  _____

15  [2] Even with the brisk-and-mortar store scenario, it's important to note that it is one
   thing to walk around with videos in a cart without publicizing to anyone what is in

16  one's cart without assistance from a store employee, and it would be quite another if a
   cashier at the store forwarded the list to some third-party indicating every video title in

17  the customer's cart along with the customer's name and other identifying information.

18  [3] An analogous situation at a brick-and-mortar store might be if: a customer walked in
   the door and a store clerk began the transaction by obtaining the customer's FID and

19  then followed the customer around the store for the entire time, taking notes on every
   action the customer took; that customer had to request certain titles from the store clerk

20  to purchase them; the clerk responded by taking those titles and storing them at a
   checkout counter designed for that particular customer; and then the clerk immediately

21  sent to Meta detailed notes on every observation that the clerk made and every title that
   the customer requested along with the customer's FID, pursuant to a pre-existing

11

1    Defendants cite *In re Hulu*, 86 F. Supp. 3d at 1095 for the proposition that adding

2    a title to a shopping cart "might reveal information about a specific person and a video

3    title, but it is missing anything showing a 'request' for that video content."  Mot. at 9.

4    In reality, *In re Hulu* simply does not say or suggest that adding something to a

5    shopping cart online is not a "request."  In fact, it didn't say much about requests at all.

6    That decision, rendered at the summary judgment stage, dealt with Hulu transmitting

7    information to Facebook after Hulu's users engaged with a "Facebook Like button"

8    that Hulu added to each of its watch pages.  *Id.* at 1093-94.  The relevant issue, the

9    "dispositive point in the case," *id.* at 1097, was not whether Hulu's users had made a

10    "request" (an answer that would be inapposite to this case in any event, since here users

11    weren't "liking" things but were actually requesting certain titles for purchase), but

12    rather, that there was a "*lack* of a known connection" between the user's identity sent

13    in the c_user cookie "and the title of the videos that user watched." *id.*

14    In sum, Plaintiffs have clearly alleged the disclosure of PII and information on

15    video titles requested and they've clearly alleged that it was done in connection with

16    requests and purchases.  Defendants proffer no authority even suggesting otherwise.

17    The Motion should be denied.

18

19    _____

20    arrangement between the store and META so that the store could make a profit off of
that information.  Surely, that would have been the type of violation of privacy that the
drafters of the VPPA would have found worthy of deterrence.

21

**B.    Plaintiffs are consumers under the VPPA.**

Defendants next argue that Plaintiffs are not consumers within the meaning of the VPPA.  Under the statute, a consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710.  Plaintiffs clearly and repeatedly allege that they purchased goods from Defendants.  *See, e.g.*, FAC ¶¶ 10 (Plaintiff Archer "requested prerecorded video material from Defendants," and "was directed to a checkout screen where he purchased and thus obtained the requested video"), 14 (the same allegations for Plaintiff Cohn).  Defendants do not contest that they are "video tape service providers."  This should be the end of the inquiry as to whether Plaintiffs are "purchasers" and, accordingly, "consumers."  Defendants attempt to cloud what is a clear answer here, but their attempts fail.

Defendants start by discussing *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015).  *Ellis* does little to help Defendants' case.  As they acknowledge, *Ellis* concerned whether the plaintiff was a "subscriber" of Cartoon Network's video streaming service and therefore a VPPA "consumer."  Mot. at 11 (quoting *Ellis*, 803 F.3d at 1254).  Defendants acknowledge that *Ellis* is not like this case when they point out that the plaintiff in that case "did not purchase or rent anything from the defendant"—unlike the allegations here.  *See* Mot. at 11.  It goes without saying then that *Ellis* offers little guidance on whether Plaintiffs were purchasers for purposes of the VPPA.

1    *Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056 (S.D. Cal. 2023) is inapposite for

2    the same reason—it involved a plaintiff alleged to be a subscriber.  However, even if

3    *Tawam* concerned purchasers instead of subscribers, it still wouldn't do the lifting that

4    Defendants want it to.  Defendants cite *Tawam* when they make the baffling assertion

5    that "even if the disclosed 'add to cart' actions are 'requests' under the VPPA . . . those

6    disclosures do not 'concern' VPPA consumers because they do not reflect any

7    'existence of a factual nexus' to a video purchase, rental, or subscription."  Mot. at 11

8    (quoting *Tawam*, 684 F. Supp. 3d at 1061).  It's not clear how Defendants find support

9    for that assertion from a reading of *Tawam*.  In *Tawam*, the plaintiffs had viewed videos

10   on the defendant's website and then, after the fact, "separately" signed up for the

11   defendant's "email mailing list."  684 F. Supp. 3d at 1062.  Although the court didn't

12   expressly say so, it's clear from a reading of the case that the defendant's "email list

13   serve," *id.* at 1058, was unrelated to the videos that the plaintiffs watched and certainly

14   did not allow them to watch those videos.  For example, in that portion of the opinion,

15   the court cited *Carter v. Scripps Networks, LLC*, No. 22-cv-2031, 670 F.Supp.3d 90,

16   99 (S.D.N.Y. Apr. 24, 2023), where another court found that the plaintiffs' subscription

17   to the defendant's newsletter did not enable the plaintiffs to sue because they did not

18   allege that their "status as newsletter subscribers was a condition to accessing the site's

19   videos, or that it enhanced or in any way affected their viewing experience."  Unlike

20   *Tawam* or *Carter*, here the nexus between "the alleged [purchase] and the video content

21   at issue," *Tawam*, 684 F. Supp. 3d at 1062, is crystal clear.  Plaintiffs do not allege that

14

the Defendants video-provider websites do anything other than "advertise, make available for sale, and sell prerecorded video materials." FAC ¶ 18. They do not allege that they could do or did anything else on those websites other than browse, request and purchase videos. *See id.* ¶¶ 10-11, 14-15. And finally, they allege that Defendants' actionable conduct consisted of disclosing, inter alia, Plaintiffs' unencrypted FID, information about what items Plaintiffs add to their shopping carts, and detailed information revealing the titles requested. *E.g., id.* ¶¶ 45, 49-53. Defendants cite no decision from any U.S. Court of Appeals pronouncing a requirement of a showing of a "factual nexus," much less in cases that involve purchasers instead of subscribers, and while Plaintiffs do not concede that they must show a nexus; one is nonetheless clearly alleged in this case.

Seemingly aware that their nexus argument gets them nowhere, Defendants then claim that disclosures cannot form the basis for a violation of the VPPA if the disclosures "occurred *before* any purchases." Mot. at 12. They contend that "where a plaintiff becomes a VPPA consumer only after viewing video content and after a defendant allegedly discloses his viewing material to a third party the VPPA does apply." *Id.* This argument is just an attempt to rewrite the definition of "consumer" by adding a time constraint to the definition when there is none. Not a single case cited by Defendants supports such a constraint. They cite *Tawam* (again, a case involving subscribers) where the court found an absence of a nexus between the "actionable video content" and newsletters that the defendant signed up for after the fact. *Id.* (quoting

15

684 F. Supp. 3d at 1062).  But totally absent from *Tawam* was any indication that the court found in the law or intended to pronounce a bright-line rule about the timing of disclosures, much less in cases concerning purchasers instead of subscribers.  *See* 684 F. Supp. 3d. at 1061-62 (noting that "a number of courts have held that [a] *subscription* must involve some type of commitment, relationship, or association between a person and an entity") (emphasis added) (citation and internal quotation marks omitted).

Defendants' reliance on *Rodriguez v. JP Boden Servs. Inc.*, No. 23-CV-00534-L-VET, 2024 WL 559228 (S.D. Cal. Feb. 12, 2024), is similarly misplaced.  They cite *Rodriquez* for the proposition that, "if a plaintiff purchased something from a defendant before an alleged disclosure of video viewing activity but did not make a purchase in connection with the video-related activity, the VPPA does not apply either."  Mot. at 12 (citing *Rodriquez*, 2024 WL 559228, at *3).  The court in *Rodriquez* said no such thing.  *Rodriquez* involved a plaintiff claiming "purchaser" or "subscriber" status.  However, the plaintiff did not say when she purchased goods from the retailer.  She "simply state[d] that she was a purchaser of goods from Defendant" but didn't make clear when, and she made "no assertion that she suffered the complained of injury in association with that purchase in the past."  2024 WL 559228, at *3.  It was also "unclear where Plaintiff purchased any goods from the Boden site at the time she viewed the video."  *Id.*  Given those pleading shortcomings, the court found that the plaintiff had not sufficiently alleged she was a purchaser under the VPPA.  The court's holding turned on the fact that she had not alleged that she suffered an injury in

16

1   connection with a purchase. Again, in that case, the court did not suggest some bright-

2   line rule. And because in this case, the FAC clearly and expressly connects Plaintiffs'

3   purchases with the prerecorded video materials, *Rodriguez* is inapposite.

4          Finally, Defendants suggest the *Eichenberger* supports the timing requirement

5   that they try to inject into the statute. It plainly does not. Defendants cite language

6   from that opinion where the Ninth Circuit endorsed an "ordinary person" test when

7   asking, "what information did Congress intend to cover as 'capable of' identifying an

8   individual?'" 876 F.3d at 984-85. But as the decision makes clear—including by using

9   a heading titled "Personally Identifiable Information"—the court there was addressing

10  what constitutes PII, not what constitutes a consumer, a renter, a purchaser, or a

11  subscriber. *Eichenberger* did not, as Defendants assert, Mot. at 13-14, state that a video

12  service provider must know in advance which shoppers will eventually make a

13  purchase. It explained that an "ordinary person" standard is better suited to the VPPA

14  because a video service provider has to know in advance what types of information

15  qualify as PII. 876 F.3d at 985. Also, the court did not say that not knowing in advance

16  who might purchase something "'would make the lawfulness of a disclosure depend

17  on circumstances outside of a video service provider's control.'" Mot. at 13 (quoting

18  *id.*). It explained that adopting a standard other than an "ordinary person" standard

19  would leave "video service providers with[out] enough guidance" about what

20  information is PII "to comply with the VPPA's requirements." 876 F.3d at 985.

21  *Eichenberger* offers no support to Defendants.

17

1    Finally, Defendants are simply wrong when they assert that a time restriction is

2    needed because otherwise, "a business *cannot* know whether a disclosure implicates

3    the VPPA at the time the disclosure is made because the subject of the disclosure might

4    later purchase video materials from the defendant." Mot. at 13. Defendants are able

5    to determine what sort of disclosures implicate the VPPA for *every* person who visits

6    their webpage. A customer making a purchase doesn't magically convert innocuous

7    information into actionable PII. Defendants can protect themselves in the shadowy fog

8    of uncertainty about which of its visitors will ultimately make a purchase by simply

9    choosing not to make wholesale disclosures of visitors' personal, private information

10   that violate the law. *See* FAC ¶ 69 (Defendants could "easily have programmed their

11   websites" to not transmit the relevant information but "chose to program their websites

12   so that all of their customers" information was disclosed). In that way, they'll have all

13   the certainty they need.

14   **C.    Defendants knew that they were making prohibited disclosures.**

15        1.    <u>Defendants knew what identifying information they disclosed.</u>

16   Defendants next arguments go to the issue of their knowledge of their

17   disclosures. In part one of this final chapter, Defendants argue—stunningly—that

18   Plaintiffs do not allege that they knew or could have known the identifying information

19   what it disclosed. Mot. at 14-16. More specifically, Defendants' argument is that they

20   can't be held liable for transmitting identifying information to Meta because they didn't

21   look at it before they sent it, and thus they didn't know that they were sending it.

18

Defendants' argument is disingenuous and, as one would predict, they cite no authority to support it.

Defendants again rely on *Eichenberger* and, again, swing but miss. The court in *Eichenberger*, applying the "ordinary person" standard that it had just adopted to determine what constitutes PII, found that the plaintiff had not alleged the disclosure of PII because "an ordinary person could not use the information that Defendant allegedly disclosed to identify an individual." 876 F.3d at 986. More precisely, only Adobe could match individual Roku device serial numbers with other information derived from 'an enormous amount of information' collected 'from a variety of sources,'" something that the court found an ordinary person could not do. *Id.* But the court did not say that a VPPA violator has to have reviewed information prior to its sending for it to be qualify as identifying. And, as relevant here, it expressly left open the possibility that "[a] Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual." *Id.* That is nearly exactly the case here, where Plaintiffs have alleged that an "ordinary person could learn the identity" of the person whose Facebook ID was transmitted "simply by accessing the URL www.facebook.com/ and inserting" that ID. FAC ¶ 66; *see Smith v. Trinity Broad. of Texas, Inc.*, No. 8:24-CV-01046-JVS-ADS, 2024 WL 4394557, at *2 (C.D. Cal. Sept. 27, 2024) (citing *Eichenberger* and writing that a Facebook link is PII "that enables an ordinary person to identify an individual"). Unlike Adobe having to cull from an

1  "enormous amount of information" from a "variety of sources," most ordinary internet

2  users are able to copy and paste text into an address bar and hit the "enter" key.

3      Lastly, Defendants assert that they have no way of accessing Facebook's c_user

4  cookie.  Mot. at 15.  Being unable to access information once it's been transmitted is

5  not the same as not knowing what the information is or that it's been transmitted.  *See*

6  *Smith*, 2024 WL 4394557, at *2 ("[T]he question is whether an ordinary person *can*

7  readily identify an individual with the PII, not whether one *would* in fact do so.").  As

8  the FAC alleges, *e.g.*, ¶¶ 48, 66, any ordinary person can use an FID number to look

9  up the identity of the person to whom the FID corresponds and thus associate that user

10  with specific prerecorded material.  The information, therefore, falls within the

11  purview of the act.

12      Defendants erroneously rely on *In re Hulu Priv. Litig.*, No. C 11–03764 LB,

13  2014 WL 1724344, at *1 (N.D. Cal. Apr. 28, 2014).  Hulu argued, like Defendants do

14  here, that it did not "knowingly" disclose information to Facebook because the cookies

15  that it transmitted were "'unintelligible' and 'owned by Facebook, and, as a result,

16  Hulu [could not] access that cookie or read information stored in it' and 'could not

17  have known what data Facebook was receiving.'" 2014 WL 1724344, at *15.  Hulu

18  contended, like Defendants, that "only servers associated with the domain that writes

19  the cookie can access that domain's cookie." *Id.*  Thus, Hulu argued, it could not

20  knowingly transmit identifying information.  The court rejected this argument.  It

21  recognized that Hulu's complaints about access did "not answer the question about

1    what Hulu knew." *Id.* "Instead, it only describe[d] how servers can read cookies. Hulu

2    may not have been able to read Facebook's cookies, but if it knew what they contained

3    and knew that it was transmitting PII—that is information that 'identified a person as

4    having requested or obtained specific video materials[]—then Hulu is liable under the

5    VPPA." *Id.*; *see also Smith*, 2024 WL 4394557, at *3 (The "knowingly" "element does

6    not require plaintiffs to allege that a third party would in fact use this information, but

7    only that the defendant knowingly disclosed information that could be used to identify

8    an individual.").

9         The fact is, and Plaintiffs allege, that Defendants knew that the Meta Pixel that

10    they *chose* to install on their sites was disclosing their customers' PII to Meta. *Id.* ¶

11    68. They cannot seriously contend otherwise. Meta advertised on its Meta Pixel "Get

12    Started" page that installation of the pixel on a company's website allows Meta to

13    "match [] website visitors to their respective accounts." *Id.* ¶ 48. Meta's Business

14    Tool Terms, which govern the use of Meta Pixel, state that website operators can use

15    the pixel to transmit "contact information," which those terms define as "information

16    that personally identifies individuals, such as names, email addresses, and phone

17    numbers." *Id.* ¶¶ 50-52. The terms expressly state that, "*You instruct us to process* the

18    Contract Information solely to match the Contact Information against user IDs [their

19    FIDs], as well as to combine those user IDs with corresponding Event Data." *Id.* ¶ 53

20    (emphasis added). It is stupefying that Defendants would install Metal Pixel on their

21    websites fully aware that the Pixel would send to Meta information about all of their

21

Facebook-using visitors and then come before the Court and claim that they had no idea that the Pixel would do exactly what they were told it would do just because they didn't sift through the information themselves before it was sent to Meta for processing.  The Court should reject this feigned ignorance defense.  *See, e.g.*, *Smith*, 2024 WL 4394557, at *3 (rejecting the same arguments that Defendants make here, reasoning that when the defendant installed Meta Pixel, it was "knew the FIDs would be transmitted by a user's browser due to its installation of Pixel on their Website"); *Fan v. NBA Properties Inc.*, No. 23-CV-05069-SI, 2024 WL 1297643, at *2 (N.D. Cal. Mar. 26, 2024) ("knowingly" element sufficiently alleged because complaint alleged that defendants "chose to install the Meta Tracking Pixel" to enhance advertising and used the data to build audiences and retarget its customers); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 721 (N.D. Cal. 2023) ("This Court joins others to find" "knowingly" sufficiently alleged because "defendant knowingly used the Pixel, [and] provided FIDs and URLs to Meta.") (citations omitted).

        2.    <u>Defendants knew that they disclosed "consumers'" PII.</u>

Defendants finally argue that the "FAC does not allege that [they] knew [they were] disclosing information about a statutory 'consumer,'" because "Plaintiffs do not allege that [Defendants] had any way of knowing whether Plaintiffs were 'consumers' when they added videos to their carts."  Mot. at 17.  Once again, Defendants offer no support for this argument.  As the FAC alleges, by choosing to install Meta Pixel on their websites, Defendants programmed those sites to "systematically transmit, via

22

1    'Meta Pixel' technology . . . the [PII] of all of their Facebook-enrolled customers to

2    Meta."  FAC ¶ 2; *see also, e.g.*, *id.* ¶ 45 ("[W]henever a Facebook-enrolled consumer

3    requests a prerecorded video product . . . the Meta Pixel technology that Defendants

4    intentionally installed on that website transmits to Meta").  Defendants did not choose

5    to discern between those Facebook-enrolled visitors who just browsed, those who

6    requested titles, and those who purchased them; they made the choice to transmit data

7    on all of them.  Boxed in by that inconvenient fact, Defendants once again attempt to

8    graft onto the VPPA a requirement that is not found in the language of the act and not

9    found in any caselaw.  Defendants would like the rule to be that they are absolved of

10    liability under the VPPA if they sent their Facebook-enrolled visitors' identifying

11    information to Meta and now say, "Yes, but we couldn't know which of those visitors

12    would buy something!"  The fact of the matter is, Defendants didn't care who would

13    end up buying something—they installed the Meta Pixel on their websites fully aware

14    that it would unlawfully transmit information on *all* their Facebook-enrolled visitors.

15    They offer no support for the escape hatch that they propose and there is no reason to

16    provide them one.

17         Plaintiffs have more than adequately alleged Defendants' knowing disclosure.

18    They have adequately alleged that Defendants violated the VPPA.  The Motion should

19    be denied.

20

21

23

# V.    CONCLUSION

Defendants only challenge whether Plaintiffs have adequately alleged disclosures of PII "concerning any customer" and that those disclosures were made knowingly. The FAC is replete with allegations meeting those elements. Defendants have the burden to show that dismissal is warranted and none of the authorities they cite direct any other conclusion. Accordingly, Defendants' motion should be denied in its entirety.

In the event that the Court grants the motion, Plaintiffs respectfully request leave to amend.

Dated:  March 28, 2025                    Respectfully submitted,

By: /s/ *Frank S. Hedin*          .

FRANK S. HEDIN (SBN 291289)
**HEDIN LLP**
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
E-Mail:       fhedin@hedinllp.com

JULIAN HAMMOND (SBN 268489)
**HAMMONDLAW, P.C.**
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Telephone:   (310) 601-6766
Facsimile:    (310) 295-2385
E-Mail:       jhammond@hammondlawpc.com

*Counsel for Plaintiffs and Putative Class*

24